AMERICAN PAPER & PULP CO., Inc.

v.

Maurice DENENBERG, individually and trading as Denny Paper & Board Co., Defendant and Third-Party Plaintiff

and

Lansdowne Paper Mill, Inc., Third-Party Defendant.

Civ. A. No. 13623.

United States District Court
E. D. Pennsylvania.

July 14, 1955.

Martin Feldman, Philadelphia, Pa., for plaintiff.

Aaron M. Fine, Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., for defendant and third-party plaintiff.

Morris M. Wexler, Wexler, Mulder & Weisman, Philadelphia, Pa., for third-party defendant.

CLARY, District Judge.

This is an action to recover damages for an alleged breach of a written contract. By the terms of the contract defendant was to supply plaintiff with 55 tons of pure MF Kraft paper in two lots, one of 33 tons and the other of 22 tons. Both plaintiff and defendant were middlemen. Plaintiff sold the paper to Topic & Nell, a South African customer, who intended to manufacture paper bags with it. Defendant purchased the paper from Lansdowne Paper Mill, Inc., who was to manufacture the paper. The defendant herein joined Lansdowne as third-party defendant, alleging that if the defects complained of in the paper did in fact exist, they constitute a breach of the contract under which the defendant purchased the paper from the third-party defendant and, therefore, defendant is entitled to recover from said third-party defendant everything which the plaintiff may recover from the defendant. From the pleadings and proof I make the following

Findings of Fact.

1. The plaintiff is a corporation organized under the laws of the State of New York, having its principal office at 300 Fourth Avenue, New York 10, New York.

2. The defendant, Maurice Denenberg, individually and trading as Denny Paper & Board Co., is a citizen of the Commonwealth of Pennsylvania, residing in the City of Philadelphia, State of Pennsylvania, with his office and place of business at 20th and Washington Streets, Philadelphia, Pennsylvania.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

4. The plaintiff company is in the business of exporting paper and pulp from the United States and Canada; the defendant is a paper broker.

5. During August of 1951, because of the Korean War, paper supplies were extremely scarce and plaintiff was anxious to obtain a source of supply to fill orders it had on hand.

6. On August 17, 1951 the defendant visited the office of the plaintiff in New York City and exhibited a number of samples of paper to Thomas S. Greiner, Vice-President of the plaintiff company. He stated that he could supply said paper in large quantities.

7. After examining the samples and being satisfied that they generally met the standards required for an order which the plaintiff had from Topic & Nell, a South African customer, Mr. Greiner negotiated a contract with the defendant, wherein plaintiff agreed to buy and defendant agreed to sell 55 tons of pure MF Kraft paper in portions of 33 tons and 22 tons for the price of $14.50

per 100 lbs. ($290 per short ton). Samples were to be submitted for approval.

8. The following provisions of the contract are pertinent to this litigation:

Quality: Pure MF Kraft Paper, samples to be submitted for approval.

Quantity: 55 tons/2000 lbs. each.

Specifications: 33 tons basis 24 x 36" 35 lbs/500 width of rolls 21"–21"–18" 22 tons basis 24 x 36" 39 lbs/500 width of rolls 26 3/4–26 3/4–26 3/4

All rolls diameter not to exceed 28", core 3".

Packing: Rolls must be hard and evenly wound, cores fitted with pierced wooden plugs, Rolls must be securely wrapped and capped with heavy mill wrappers.

9. On August 21 1951 the defendant ordered the 55 tons of paper needed for the order from Lansdowne Paper Mill, Inc.; the contract between defendant and Lansdowne contained exactly the same specifications and requirements as the contract between plaintiff and defendant.

10. On August 23, 1951, the defendant personally delivered several sheets of a sample to Mr. Greiner.

11. Mr. Greiner, in the presence of the defendant, examined the sample and tested the bursting strength of several sheets of the paper by the use of a Mullen testing machine.

12. The results of these tests showed the bursting strength of the sample to be 27 lbs. and 31 lbs. per square inch on one sheet and 21 lbs., 26 lbs., 29 lbs. and 30 lbs. per square inch on another sheet.

13. Being satisfied with the results of his examination, Mr. Greiner approved the sample; he also agreed, at the request of the defendant, that the color of the paper to be furnished might be of a darker shade.

14. On August 24, 1951, plaintiff sold the aforesaid paper to Topic & Nell, Port Elizabeth, South Africa, at the price of $320 per short ton.

15. In accordance with shipping instruction, the 33 tons portion of the paper (to be exact 66,708 lbs.) was shipped in 228 rolls directed to the S.S. African Star port of loading, Philadelphia, Pennsylvania, on September 11, 1951.

16. By mail on September 20, 1951, the plaintiff received the outturn samples from the defendant. Outturn samples are samples taken at random from the rolls during the manufacturing of the paper.

17. Mullen tests of these samples by Mr. Greiner showed the bursting strength of the outturn samples to be 17 lbs., 21 lbs., and 24 lbs. per square inch. In further comparing the outturn sample with the original sample it appeared to the eye that while the fiber formation of the original sample was long, parallel and even throughout the paper, the formation of the outturn sample was "wild", that is, it ran in all directions, the fiber was heavy in certain areas and all but lacking in other areas. To the touch the body of the outturn sample was different than the original sample and when snapped the original sample had a sharp, cracking sound, while the outturn sample had a flabby, weak sound.

18. The bursting strength of the outturn sample was more than 20% less than the original sample and as to the other properties mentioned in Finding of Fact No. 17, the quality of the outturn sample was clearly inferior to the quality of the original sample.

19. By letter dated September 21, 1951 the plaintiff advised the defendant of this fact and cancelled the order for the undelivered 22 tons; the shipment of the 33 tons was already on the high seas.

20. By a separate letter, also dated September 21, 1951, the plaintiff sent defendant a check for $7,746.13, an amount 20% less than the invoice price, for the 33 tons shipped; the 20% being retained in anticipation of the necessity of having to make a price adjustment with Topic & Nell because of the inferior quality of the paper supplied as indicated by the outturn samples.

21. By letter dated November 22, 1951, plaintiff received a rejection of the

entire shipment from Topic & Nell, and by letter dated December 5, 1951 plaintiff advised the defendant accordingly.

22. When the paper arrived in South Africa it was taken to the premises of Topic & Nell who attempted to use it for the manufacturing of paper bags; they found the paper completely unsatisfactory and unsuitable for the manufacturing of paper bags and because of this fact they rejected the entire order as aforesaid.

23. Shortly after they found it necessary to reject the paper, Topic & Nell had a Lloyd's survey made and sent copies of the report to the plaintiff, who, in turn, advised the defendant of the findings.

24. The paper supplied did not meet the specifications of 58 grams contained in the contract; it was generally 53/54 grams and it went as low as 40 grams.

25. There were long dark streaks of a few inches in width running through portions of the paper supplied.

26. The paper supplied contained numerous round areas of undigested pulp, some as large as 3″ in diameter; and when held up to the light, pinholes could be seen throughout the paper.

27. While the average roll had from two to three joins, the rolls supplied had considerably more.

28. The diameter of the rolls supplied exceeded 28″, the size specified in the contract; some rolls measured as much as 34″ in diameter.

29. A great portion of the cones in the 228 rolls collapsed completely or were out of shape and many rolls were unevenly wound.

30. The paper supplied was not suitable for the manufacturing of paper bags; had it met the specifications of the contract and the standards of the sample, however, it would have been suitable.

31. With the concurrence of the parties, Topic & Nell sold the paper in South Africa for $4,568, which sum they remitted to the plaintiff. The paper was eventually used as wrapping paper, a proper use for Kraft paper.

32. On February 7, 1952 plaintiff shipped 84,348 pounds of paper to Topic & Nell. The total cost of this paper to plaintiff was $6,615.05. A pro rata share of said paper was supplied to Topic & Nell at no cost in settlement for the loss herein complained of; said pro rata share cost plaintiff $5,232.09.

33. Plaintiff received the full contract price of $320 per ton from Topic & Nell, as aforementioned.

34. Plaintiff supplied this replacement shipment with its February quota from Hudson Paper Co., a regular supplier. With the start of the Korean War and the resulting shortage of paper supply, the larger mills had adopted a quota system in order to assure equitable distribution of their supply to their regular customers.

35. In the contract between plaintiff and defendant the paper ordered was simply described as: Kraft paper. In the contract between plaintiff and Hudson Paper Company, however, the paper ordered was described as: Bag Kraft paper.

36. There are no generally established and accepted trade standards as to quality differences between "Kraft paper" and "Bag Kraft paper"; in fact, it would seem from the record, as indeed logic would dictate, that "Kraft paper" is generic and encompasses all paper of that type, regardless of the use classification adopted.

37. There are, however, these important considerations to be noted in having a label attached to Kraft paper: (a) at the time of the shipments there were no tariffs on Bag Kraft paper, although, since that time Bag or Sack Kraft paper has come under tariff regulations; (b) at the time of the shipments there was no commodity rating by the shipping companies on any other type of paper other than Kraft wrapping paper and, if the paper was not so described, a general cargo rate would be assessed, the freight

charges for which would be about three times the rate of "Kraft wrapping paper".

38. Kraft paper is properly used for the manufacturing of paper bags as well as for wrapping paper. Although this Court can find no trade accept use classification, it is clear that better grades of Kraft paper can be converted into bags, because of the utility to which bags are put.

## Discussion.

■■■ Upon these facts the plaintiff claims damages for breach of warranty. The defendant argues that there can be no liability for breach of warranty because the contract does not specify the purpose for which the paper was to be used. He maintains that the plaintiff's allegation that the paper was nothing more than "waste paper" is not, and cannot be, true in view of the fact that plaintiff itself received the money from Topic & Nell when the paper was sold by them in South Africa to a company which, in fact, used the paper as wrapping paper. He maintains that this is most important because there is a difference between Kraft paper which is to be used for the manufacturing of paper bags and Kraft paper which is to be used for other purposes. In essence, defendant's argument is: Kraft paper was ordered, Kraft paper was supplied; there was no stated purpose for its use, there can be no breach of warranty.

Defendant's argument and conclusion might be correct if the theory of liability were breach of warranty for fitness of purpose. Section 15 of the Pennsylvania Sales Act, 69 P.S. § 124, reads:

"Subject to the provisions of this Act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: First. Where a buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears

that the buyer relies on the seller's skill or judgment, there is an implied warranty that the goods shall be reasonably fit for such purpose."

Without discussing what knowledge can be made known by implication, it suffices to say that it would be little short of conjecture to find from the record in this case that the defendant knew for what purpose the paper was purchased at the time the contract was entered into. The defendant overlooks Section 114 of the Pennsylvania Sales Act, however, 69 P. S. § 123, which reads:

"Where there is a contract to sell or a sale of goods by description, there is an implied warranty that the goods shall correspond with the description, and if the contract or sale be by sample, as well as by description, it is not sufficient that the bulk of the goods corresponds with the sample if the goods do not also correspond with the description."

This section was recently considered in the case of Farrey's, Inc., v. Supplee-Biddle Hardware Co., D.C.E.D.Pa.1952, 103 F.Supp. 488. As in the Farrey's case, we have here a sale by sample and by description and we again state that in such instances "not only must the bulk correspond with the sample, it must also correspond with the description." Here, the rolls of paper to be supplied were not to exceed 28″ in diameter; they were to be evenly wound, the cores were to be protected by wooden plugs, and the paper, except as to color, was to be of the same quality as the sample. That the paper supplied did not meet these specifications is quite evident from the Court's Findings of Fact. More particularly I refer to Findings of Fact Nos. 22 to 29 inclusive. I need not, therefore, consider the limitations of Section 15 of the Sales Act, as the defendant contends, for they do not apply. Regardless of the purpose to which Topic & Nell was to put the paper supplied, it did not meet the description contained in the contract nor did it comply with the standards set by the sample. Plaintiff, there-

fore, established his right to maintain this action even without the finding that had the paper met the standard of the sample it would have been suitable for the manufacture of paper bags.

Defendant has directed a major portion of his argument to the fact that there was a drop in the market price of Kraft paper shortly after the contracts herein were entered into. For this reason, and from the fact that Topic & Nell attempted to get plaintiff to release them from their contract or reduce the price, the defendant wants this Court to draw the inference that the complaint made about the quality of the paper is greatly exaggerated, if not completely fabricated. The record does not support this. There is nothing in the record which would lead this Court to believe that both plaintiff and Topic & Nell acted in any way other than honorable, though both were tough, experienced business firms. The correspondence between the parties clearly establishes this and the fact that the replacement paper was supplied at the contract price renders this position untenable; there is no suggestion of collusion on the parts of plaintiff and Topic & Nell.

The difficult feature in this case is the damages suffered by plaintiff. Some time was spent by both sides in arguing the point at the time of trial and a substantial part of each brief is devoted to the matter. The plaintiff sets its damages at $11,294.26, while the defendant maintains that at best the total loss to plaintiff is $343.87. The rule governing special damages is well known and was early established in the leading English case of Hadley v. Baxendale, 9 Ex. 341 (1854). This has been the rule in Pennsylvania by case law since Fleming v. Beck, 48 Pa. 309, 1865; and it has been incorporated into Section 69 of the Uniform Sales Act, 69 P.S. § 314, which reads:

"The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty."

The decisions interpreting the rule are numerous and, of necessity, each turns on its own facts. This Court has recently applied Section 69 to a rather unusual fact situation in Farrey's, Inc., v. Supplee-Biddle Hardware Co., supra. I note that both plaintiff and defendant have cited this case as supporting their respective positions. In that case we had a sale, by sample and description, of rolls of barbed wire. The seller had described the rolls as 56 pounds in weight and approximately 58 rods in length. It eventually developed that the bulk of the wire was only 40 rods in length; the buyer, however, had resold the rolls before discovering this shortage in length. It was held that where the buyer's liability to its customer under judgment was directly attributable to the shortage, the buyer was entitled to recover the amount of such judgment from the seller upon proof of breach of warranty. Where the plaintiff had received the same price from its customer for "short" rolls that it would have received for full length rolls, the buyer was not entitled to recover for breach of warranty since there was no diminution in value to it by reason of the breach.

The difficulty in the instant case arises out of the fact that the plaintiff did not return cash to its buyer in satisfaction of the loss, but rather it supplied Topic & Nell with a quantity of paper in excess of 33 tons at a later date and a pro rata part of that quantity was supplied at no charge in settlement for the herein complained of loss. Because of market conditions the replacement cost to plaintiff was $5,232.09, an amount substantially less than the price it had contracted to pay defendant; plaintiff, however, received the full contract price from Topic & Nell. We now have what we can term a "second profit"; that is, the difference between the amount of profit plaintiff would have made had the original shipment been satisfactory and the amount it did make because of the lower cost of

the replacement shipment. The problem, therefore, is this: Is plaintiff entitled to said profit or is it to be applied to reduce the loss?

The defendant argues that plaintiff is not entitled to any such monies, because under Pennsylvania law the injured party is entitled to recover no more than his actual loss; citing, Pittsburg Sheet Manufacturing Co. v. West Penn Sheet Steel Co., 1902, 201 Pa. 150, 50 A. 935; Popkin Brothers v. Dunlap, 1938, 130 Pa. Super. 50, 196 A. 586; Delmont Gas Coal Co. v. Diamond Alkali Co., 1923, 275 Pa. 535, 119 A. 710; Farrey's, Inc., v. Supplee-Biddle Hardware Co., supra. From Pittsburg Sheet Mfg. Co. v. West Penn Sheet Steel Co. he quotes: "The object of the law is to compensate the party injured. He is entitled to this, and nothing more, and in all cases compensation must be limited to the loss actually sustained. If the buyer purchases goods in place of those contracted for at less than the market value, and thus reduces the loss, he can recover only the actual loss." This, of course, is a valid proposition of law; it does not, however, cover the fact situation before the Court and must be extended.

The plaintiff had to use a month's quota allotment from one of his regular sources of supply to replace the shipment made to Topic & Nell, which allotment he could have sold on a ready market. The defendant seeks to avoid this most important fact by arguing that the whole course of events are to be viewed as one transaction and that the "second profit" must be applied to mitigate damages or else plaintiff would have a windfall at defendant's expense. I cannot agree. The fact that plaintiff and his vendee chose to use this method to settle the loss complained of should not now prejudice the plaintiff. Had plaintiff chosen to settle the loss by giving Topic & Nell cash and had he sold the month's allotment to a third party and made the profit, the defendant certainly could not be heard to say that the profit from that sale should be applied to reduce the damages here. In like manner there would be little difficulty had plaintiff sold the replacement shipment to Topic & Nell in the regular course of business and settled the loss for cash. I cannot find that plaintiff forfeited his profit on this allotment shipment by accomplishing the same result without the formality of a cash settlement and purchase. It is axiomatic that the law will not require useless acts. Although a diligent search reveals no Pennsylvania cases on this point, the Restatement of the Law of Contracts, Vol. 1, page 537, covers this point when it states:

"Gains made by the injured party on other transactions after the breach are never to be deducted from the damages that are otherwise recoverable unless such gains could not have been made had there been no breach."

Here, the "gains" (the "second profit") would have been made had there been no breach. The fact that in the first instance the plaintiff was making a profit without using any of his allotments from his regular mills is of no consequence. These were not governmental or legal restrictions of any kind, they were restrictions imposed by the individual paper mills as "good business" practice. That the plaintiff was able to purchase outside of these restrictions was also "good business" on its part and not a windfall which he must now forfeit.

■ Computing the damages now becomes a mechanical task. First, we have the money paid by plaintiff to defendant on account when the merchandise was shipped: $7,746.13; added to this we have the costs for ocean freight and forwarding charges: $1,054.31; insurance: $68.78; and landing charges: $400.61. The plaintiff's loss of profit on the entire 55 tons: $1,329.79, is also added. The plaintiff claims its loss of profit to be $1,650; this figure includes the $320.21 paid by plaintiff to its South African agents as commission. With this I cannot agree. The plaintiff did not pay a commission on the replacement transaction and this was because of the fact

that it was a replacement transaction. If it were a cash transaction, however, it would have had to pay a commission and in accordance with the above reasoning this item would be a gain which plaintiff otherwise would not have made but for the breach. These items of loss total $10,591.83; from this total must be deducted the amount received by plaintiff from Topic & Nell for salvage: $4,568. The damages suffered by plaintiff, therefore, amount to $6,023.26 on which sum will be allowed interest from October 15, 1952.

From what has been said before, it will be seen that the defendant and third-party plaintiff has a good cause of action in its suit against the third-party defendant, Lansdowne Paper Mill, Inc. The contract between the third-party plaintiff and the third-party defendant contained the identical terms as the contract upon which recovery has been allowed plaintiff in this case. Since the responsibility for the defective paper, which was the cause of the breach of the contract, rested primarily upon the third-party defendant, the defendant in this action will be allowed recovery over against the third-party defendant.

### Conclusions of Law.

1. The Court has jurisdiction of the parties and the subject matter of this action.

2. On August 17, 1951 defendant sold to the plaintiff two lots of 33 tons and 22 tons respectively of pure MF Kraft paper.

3. On September 11, 1951 defendant shipped the first 33 ton lot to the plaintiff.

4. The paper furnished failed to conform with the description contained in the contract as well as the sample originally furnished by the defendant.

5. The defendant breached the conditions of the contract.

6. The plaintiff was justified in cancelling the order for the unshipped 22 additional tons of pure MF Kraft paper.

7. The plaintiff as a direct result of defendant's breach of contract sustained damages in the sum of $6,023.26.

8. The plaintiff is entitled to judgment against the defendant in the sum of $6,023.26 with interest at the rate of 6% per annum from October 15, 1952.

9. Defendant and third-party plaintiff is entitled to judgment against the third-party defendant in the amount set forth in the preceding conclusion of law.

Both plaintiff and defendant have submitted requests for findings. The Court affirms plaintiff's Requests for Findings Nos. 1, 2, 3, 4, 5, 6 substituting in the first line thereof the word "defendant" in lieu of the word "plaintiff", 7, 9, 10, 11, 12, 13, 14, eliminating the last seven words thereof, 15, 16, 17, 18, 19, and 20. The Court denies, as stated, Requests for Findings Nos. 8, 21 and 22.

The Court affirms defendant's Requests for Findings of Fact Nos. 1, 2, 4, 6, 7 inserting the word "written" before the word "order", 8, 11, 15, 16, 17, 19, 21, 22, 23, 26, 27, 30, 31, 32, 35, 37, 38, 39, 43, 44, 45, 46, 47, 48, 50, 53, 54 and 57.

The Court denies, as stated, defendant's Requests for Findings of Fact Nos. 3, 5, 9, 10, 12, 13, 14, 18, 20, 24, 25, 28, 29, 33, 34, 36, 40, 41, 42, 49, 51, 52, 55 and 56.

The Court affirms defendant's Requests for Conclusions of Law Nos. 1, 2 and 9.

The Court denies defendant's Requests for Conclusions of Law Nos. 3, 4, 5, 6, 7 and 8.

An order for judgment will be entered in accordance with the above.